The R.J.M. Company v. Commissioner.
The R.J.M. v. Commissioner
Docket No. 2530.
United States Tax Court
1946 Tax Ct. Memo LEXIS 165; 5 T.C.M. (CCH) 491; T.C.M. (RIA) 46136; June 13, 1946
*165 1. Under the facts, respondent's disallowance in part of petitioner's addition to its reserve for bad debts, held, not unreasonable. 2. Petitioner in 1938 entered into a management contract with its president, owner of 55 percent of its voting stock which provided for a salary fixed by the board of directors and a share of the profits on a graduated scale based upon the net profits realized after payment of all expenses and after provision for payment of six percent dividends on all stock. President's total compensation thereunder was between $8,000 and $12,000 for 1938, 1939 and 1940, and was $45,677.76 for 1941. Petitioner's growth, success and profits were due in large measure to his abilities, judgment and experience. Held, the contract was an arm's length transaction and the compensation paid thereunder for 1941 was reasonable. Darius F. Johnson, Esq., and John T. Riley, Esq., 427 Title Insurance Bldg., Los Angeles, Calif., for the petitioner. E. A. Tonjes, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: In this proceeding deficiencies of $6,271.21 in income tax, $6,364.61 in declared value excess-profits tax, and $21,566.39 in excess-profits tax, all for the calendar year 1941, were determined by respondent. Two adjustments are contested by petitioner, the disallowance of $15,001.09 of an addition of $24,999.43 made to a reserve for bad debts and the disallowance of $30,677.76 of compensation of $45,677.76 paid to petitioner's president, deducted upon petitioner's return for 1941. The facts are in part stipulated and in part found from the evidence adduced. Findings of Fact Petitioner is a corporation organized under the laws of the State of California. Its income and declared value excess-profits tax return for 1941 was filed with the collector *167 of internal revenue at Los Angeles, California. Petitioner started business in 1935. During the years 1935 to 1939, inclusive, petitioner was engaged in the business of selling at wholesale builder's hardware to country lumber dealers and masonry and material dealers. In the year 1940, petitioner added to its business a structural steel department. Structural steel products were first sold in June of 1940, and the sales volume for 1940 was approximately $100,000. For the year 1941, the sales volume was between $700,000 and $800,000. The steel products were sold primarily to sheet metal shops, machine shops and fabricating snops, with some sales to shipbuilding and airplane companies and railroads. Petitioner kept its books and filed its return for 1941 on the accrual basis of accounting. It adopted the reserve method of accounting for bad debt losses. During the years 1935 to 1941, inclusive, the petitioner had charge sales and made additions to and charges against this reserve, as follows: Amount
Amount
Amount of
Basis of
Added
Charged
Year
Charge sales
Addition
to Reserve
Against Reserve
1935
$ 267,482.04
1%
$ 2,674.82
1936
493,018.88
1%
4,930.18
$ 318.01
1937
688,688.07
264.63
83.85
1938
756,833.79
827.28
1939
1,049,846.83
1/2 of 1%
5,080.03
1,222.73
1940
1,140,433.41
1/2 of 1%
5,702.73
5,128.58
1941
1,999,668.98
1% plus $5,000
24,999.43
9,906.03
*168 Petitioner had bad debt recoveries during the year 1941, in the sum of $173,25. The reserve had a credit balance as of January 1, 1941, of $11,071.94. The reserve at December 31, 1941, after addition of $24,999.43 was $26,338.59. Trade accounts receivable outstanding at January 1, 1941, amounted to $162,351.13. Trade accounts receivable outstanding at December 31, 1941, amounted to $200,334.51. On February 11, 1938, petitioner entered into a written contract with William L. Rawn whereby he was employed as general manager of the corporation. This contract was to be in effect for the period January 1, 1938, to January 1, 1948, and was entered into after being authorized by the shareholders of petitioner at the annual meeting of said shareholders held on February 10, 1938. At the time the contract was authorized by the stockholders, Rawn owned 55 percent of the petitioner's voting stock. Under the contract Rawn agreed to devote his efforts and best skill and business ability to the operation and management of the business, financial and other affairs of petitioner and was to be in charge of all petitioner's business and financial affairs as well as the employment of employees. The *169 contract provided that Rawn was to be paid annually a salary of not less than $600 per month and a percentage of the profits on a graduated scale based upon the net profits of the business for the year after payment of all taxes, interest, and other expenses (except Rawn's percentage of the profits) and after making provision for the payment of dividends on the six percent preferred stock of the petitioner, as well as a sum equal to six percent of the book value of the common shares of petitioner. The percentage of profits was to be five percent on the first $5,000 of net profits, increasing one percent for every $1,000 of net profits in excess of such $5,000, but in no event in excess of 30 percent of the net profits. In 1938, the preferred stock outstanding amounted to between $60,000 and $65,000. The common stock outstanding amounted to from 33,000 to 35,000 shares at par value of $1.00 per share. William L. Rawn was one of the organizers of petitioner and was at all times its president. Petitioner paid Rawn in the year 1935 $250 to $300 per month; for the year 1936, $300 to $400 per month; for the year 1937 a salary of $7,300; for the year 1938, a salary of $8,200; for the *170 year 1939, a salary of $8,400, plus a percentage of profits amounting to $3,042.37, or a total of $11,442.37; for the year 1940, a salary of $8,400, plus a percentage of profits amounting to $2,375.39, or a total of $10,775.39, and for the year 1941, a salary of $13,350, plus a percentage of profits amounting to $32,327.76, or a total of $45,677.76. The addition of the structural steel department to petitioner's business which materially increased its business during the years 1940 and 1941, was the idea of Rawn, who, in addition to his other duties, supervised the construction of the necessary buildings, specified the stock which went into the new steel department, hired the personnel and supervised the general sales policy. A reasonable addition for 1941 to the petitioner's reserve for bad debts was $9,998.34. A reasonable salary for the services rendered by William L. Rawn to petitioner in 1941 was $45,677.76. Opinion Petitioner had adopted the reserve method of treating bad debts. For several years the actual bad debts were trifling in amount and an addition of one percent of net charge sales to the reserve had proved more than adequate, so in 1938 no addition was made. *171 In 1939 and 1940 an addition of one-half of one percent was made and at the begining of the taxable year 1941 the reserve had a credit balance of $11,071.94, while accounts receivable outstanding amounted to $162,351.13, the reserve approximating 6.8 percent of this amount. At the end of 1941 the accounts receivable outstanding amounted to $200,334.51. Bad debts in the amount of $9,906.03 were charged against the reserve reducing the balance therein to $1,165.91. Petitioner added to the reserve one percent of the net charge sales plus $5,000, a total of $24,999.43. Respondent allowed an addition of one-half of one percent of the net charge sales, or $9,998.34, and points to the fact that this amount is practically the same as the actual bad debts charged against the reserve as showing the reasonableness of this allowance. Petitioner explains that while one-half of one percent of the net charge sales had proved an adequate amount in the past when petitioner's business was confined to selling lumber to dealers in lumber, masonry and building materials, it was faced with a different credit problem when it undertook the sale of structural steel to a different class of customers. According *172 to the testimony petitioner's stock of steel was limited and it could not compete with other suppliers having a wider range of sizes and items. It had to solicit most of this business from small machine shops or sheet metal shops and considered that dealing with such customers would be more hazardous, from a credit standpoint, than dealing with larger buyers of steel or with petitioner's old customers. Petitioner had had no prior credit experience with these buyers of steel. Inquiries through credit channels in the industry led petitioner's officers and directors to believe that it would be necessary to increase the reserve for bad debts to cover the losses from that source which might reasonably be anticipated. Discussion with representatives of another firm in Los Angeles had revealed that an attempt to increase the steel business of that concern had resulted in losses through business that turned out to be bad from a credit standpoint. A bad debt reserve is an estimate of the future losses which it is assumed will result from current business debts. The amount of the addition to be made to such reserve in any year is to be measured by the circumstances as they appear at the time *173 the estimate is made. A method or formula which produces a reasonable addition to a bad debt reserve in one year, or a series of years, may be entirely inadequate for another year when different circumstances are involved. Black Motor Co., 41 B.T.A. 300, affirmed 125 Fed. (2d) 977. Additions are generally based upon a percentage of sales or a percentage of the accounts and notes receivable outstanding, the percentage depending upon the taxpayer's experience or estimates of the collectibility of the accounts. Mertens, Law of Federal Taxation, Section 30.76, note 15. The petitioner had previously found one-half of one percent of the net charge sales a sufficient annual addition and respondent determined that the same formula would provide a sufficient addition for 1941. The petitioner considered that a change in the computation of the addition to the reserve was warranted. Since the statute Section 23 (k) (1) I.R.C. authorizes a deduction for a reasonable addition to a reserve for bad debts, only "in the discretion of the Commissioner", it is necessary for petitioner, in order to prevail upon this issue, to show clearly that the respondent *174 acted unreasonably in disallowing as a deduction a part of the addition made by the petitioner. Apex Brewing Co., 40 B.T.A. 1110, and C. P. Ford & Co., 28 B.T.A. 156. Petitioner sold about $100,000 worth of steel in 1940 in about six months of operations in that field. In 1941 the sales volume was between $700,000 and $800,000. The total volume of petitioner's charge sales in 1941 from all sources increased about $860,000 over 1940, or about 75 percent. The accounts receivable at the end of 1941 were about $38,000 greater than at the end of 1940, an increase of 23 percent. The bad debt reserve at the end of 1940 was about 6.8 percent of the outstanding accounts. The reserve at the end of 1941 which would result from respondent's computation would be about 5.6 percent of the outstanding accounts at the end of that year. The reserve resulting from petitioner's computation would be about 13 percent of such accounts. Petitioner was entering upon a new field of business and was faced with the problem of estimating the prospects of loss from bad accounts arising from this business. The fact that one other firm in Los Angeles had losses from bad credit extended *175 in this class of trade cannot be considered a sufficient ground for petitioner to assume that it will suffer the same experience and not be able to select its customers as carefully as it had in the past. The commencement of the war before the end of 1941 made it likely that the demand for petitioner's hardware and steel would be increased and the risk of losses through nonpayment of accounts would be diminished, and was a factor to be considered in estimating the credit hazard. At the end of 1941 there were accounts receivable in the amount of $200,334.51 from which some losses might be expected to result. However, we do not know how much of the outstanding balance was overdue, or how much was six months or a year overdue. Nor do we know what portion of the amount represents steel accounts, which are represented to be more hazardous credit risks, and what portion represents hardware accounts, where petitioner's credit experience was known to be good. The testimony indicated that some records had been kept of the petitioner's losses on the new accounts, but no figures were furnished. While the petitioner's experience of only 18 months in this field might not be sufficient to form a *176 satisfactory basis for judging the credit hazard, the extent of the losses actually sustained would be of some evidentiary value in determining the reasonableness of one or the other proposed addition to the reserve. Although petitioner's actual bad debts charged off had substantially increased in 1940 and 1941, it cannot be assumed that a continuance of the upward trend was inevitable. The reserve remaining pursuant to respondent's computation was sufficient to cover losses for 1942 in the same amount as in 1941. Under the circumstances we cannot say that petitioner has clearly shown the respondent's determination to be unreasonable and therefore we hold for the respondent upon this issue. Petitioner paid William L. Rawn, its president, as remuneration for the year 1941, a salary of $13,350 and a percentage of profits amounting to $32,327.76, or a total of $45,677.76. Respondent determined that $15,000 was reasonable compensation for Rawn's services and disallowed the difference of $32,677.76. This action is alleged as error. Rawn testified that from 1927 to 1930 he had been employed by various employers in the Pacific Northwest dealing with lumber, plywood, millwork or building *177 material as manager or sales manager, and received compensation ranging from $12,000 to $30,000 per annum. From June 1931 to January 1935, he was employed by the Hawaiian Cane Products Company as sales manager (and part of the time as vice-president) with compensation of $12,000 per annum with provision for a percentage of the profits. In 1935 he formed the petitioner corporation, supplying the entire original capital contribution of $16,500. Some stock was given to his associates for contributing their knowledge of the business and some 6 percent cumulative preferred stock was sold through his associates to a limited number of holders. Rawn's salary in 1935 was $250 to $300 per month; in 1936 it was $300 to $400 per month; and in 1937 it was $7,300. In 1937 one of his associates, apprehensive lest Rawn leave the company to accept employment elsewhere, asked that a contract be made between Rawn and the petitioner to provide for a salary and percentage of the profits sufficient to insure the retention of Rawn's services. In 1938 the contract was effected providing for compensation to Rawn, after payment of all other expenses and provision for dividends on the preferred stock and six *178 percent of the book value of the common stock, of a salary of not less than $600 per month and a percentage of the profits depending upon the amount thereof and ranging from five percent on the first $5,000 thereof to a maximum of 30 percent of the profits. Under this contract Rawn received a salary of $8,200 for 1938. For 1939 he received a salary of $8,400 and a share of the profits amounting to $3,042.37, a total of $11,442.37. For 1940 he received a salary of $8,400 and a share of the profits amounting to $2,375.39, a total of $10,775.39. Under respondent's regulations (section 19.23 (a)-6 of Regulations 103) [1] a contingent salary paid under a contract between employer and employee made before the services are rendered should generally be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. The compensation for 1941 was considerably in excess of the compensation for prior years, yet it was pursuant to the same contract that governed Rawn's salary for 1938, 1939 and 1940. The increase was manifestly due to a substantial increase in the profits of petitioner for the year 1941. The *179 stockholders were adequately protected by the contractual requirements that dividends on the preferred stock and six percent of the book value of the common stock be provided for before any contingent compensation was available to Rawn and that his contingent compensation be limited to 30 percent of the profits resulting thereafter, leaving 70 percent available for additional dividends. While Rawn held a majority of the voting stock at the time the contract was made and could have dictated its terms, it does not appear to be unfair to the other stockholders and its approval appears to have been unanimous. *180 In William S. Gray & Co. v. United States, 35 Fed. (2d) 968, salaries and contingent compensation were paid to six officers of a corporation under a resolution of the board of directors whereby all the profits, after a dividend of 7 percent per annum to the stockholders, were divided among the officers. The compensation to one of these officers amounted to $257,000 for one particular year and averaged $99,000 annually over a period of several years. The compensation there was held to be reasonable and deductible as business expenses in determining net income of the corporation. See also J. D. Van Hooser & Co. v. Glenn, 50 Fed. Supp. 279, and Draper & Co. Inc., 5 T.C. 822. In the Draper case we held that a contingent bonus formula adopted prior to the taxable year whereby the holder of a majority of the stock and certain other officers received a share of the profits, the principal stockholder receiving $132,000 as his portion, was an arm's length transaction and the compensation paid pursuant thereto was reasonable. Rawn was at all times the president and general manager of petitioner, dictating its policies in collaboration with the employees, *181 and acting as credit manager. As general manager he devoted his efforts and ability to the operation and management of the petitioner. He was in charge of all its affairs. He was 47 years of age in 1941 and it is shown that since 1927 he had held responsible positions in managerial capacities and had earned from $12,000 to $30,000 per annum before organizing petitioner. He conceived the idea of the steel department and in connection with it he assumed personal liability for petitioner's borrowings to finance the department. He was responsible for letting the contracts for construction of buildings, selecting the stock of steel to be carried, hiring the necessary personnel, passing on credit risks, determining general sales policies, and for the distribution of the steel and collection of the accounts. It appears that the successful operation of petitioner's entire business was in a large measure due to Rawn's abilities, judgment and experience. After forming the petitioner corporation he had for several years received substantially less salary than before. In four years' operations under the contract including the taxable year his compensation averaged about $19,000 per year, which *182 is not out of line with his previously demonstrated earning capacity. We think the contract entered into in 1938 was a fair contract and should be deemed an arm's length transaction and that the compensation paid for 1941 pursuant thereto was reasonable. Accordingly we sustain the petitioner upon this point. Decision will be entered under Rule 50. Footnotes
1. (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.↩